Good morning everybody. Day three of our sitting here in Montgomery. Welcome to all of you. I'm pleased to have you back. We've got Judge Karnes. I think you can see on the monitor. We see him here. I hope you see him here. Judge Karnes, can you hear us okay? We are good to go. Okay, so we've got four cases this morning. Before we get going, just a few rules of the road. Most of you have heard me say this before, but please rest assured that we have read the materials. We've read your briefs, the cases, the statutes, the record. We're familiar with them, and so in the limited time you have before us today, please just get right to it. Whatever it is that you think drives the decision in your favor, start talking about it right away. No need to ramp up with a lot of factual and procedural history. Second, you'll understand the traffic light system here. When the yellow light goes off, just understand that your time is coming to a close. When the red light goes off, not going to cut you off mid-sentence. There's no trap door into which you will disappear, and I suspect that we may go over. If we carry you over, don't sweat it. As Judge Marcus likes to say, you're on our time, not yours. But at some point we will ask you to wrap up and move on. All right. So with that, let's call the first case. This is 21-12355, Net Choice, LLC versus the Attorney General of the State of Florida. We have Mr. Barnes here for the State, Mr. Clement here for Net Choice. Mr. Barnes, you're up first. Looks like you've reserved five minutes. That's correct. Very well. Good morning, Your Honor, and may I please support on Brian Barnes for the defendants. The central question in this appeal is whether social media platforms are expressing some kind of message when they post billions of posts made by their users on every conceivable topic. Unlike the individual elements that come together to form a parade, there's no common theme or collective point that's being made through this enormous volume of unrelated material that these platforms have. So let me just ask you a question since you've analogized the parade and Hurley. What would you call the theme of the parade and Hurley? The theme in Hurley was things that are worthy of celebration on St. Patrick's Day in Boston. And Justice Souter's opinion for the court makes that very clear, that that is the common theme that the parade was expressing and that that was enough to trigger the protections of the First Amendment. And what was the theme of Comcast or whoever the cable carrier was in Turner? What was the theme of the cable package? So the common theme there was more difficult to discern, and that's part of the reason that the Supreme Court applied intermediate scrutiny. Fair enough, but you've used this common theme argument to suggest that the platforms here are not entitled to First Amendment protection at all, in essence. And Turner certainly doesn't stand for that proposition. Well, let me explain why Turner does provide constitutional protection to the cable operators. And the reason is because of the economic structure of the market there, where there was a limited number of channels that the physical cable could transmit. And the cable operators were affiliated with certain channels that they were responsible for producing. And so by imposing these must-carry obligations on the cable operators, what Congress was doing was, in effect, saying cable operator, even if you would prefer to carry one of your own channels over the cable, we're not going to allow you to do that. Instead, we're going to impose this obligation on you to carry someone else's broadcast channel instead. So can I ask you a question? So, I mean, I gathered from your introductory remarks here that what you're really driving at is that Twitter, YouTube, Facebook, et al., are not really speakers at all. They're just collectors of other people's speech. That's correct, Your Honor. What if Twitter, for instance, just came out of the closet and said, we're going to be the liberal social media platform? I don't understand why, as a private company with First Amendment rights, it's not entitled to do that. Well, so I guess a couple of responses to that, Your Honor. First, it's important to keep in mind that the consistent manner provision of the statute actually wouldn't prevent Twitter from doing that. It would be perfectly free to announce that that is its content moderation policy. But I guess what Twitter might say in response is we don't want to be consistent. We want to be liberal. Well, and they can be consistently liberal under this statute. There's no problem if Twitter writes a content moderation policy that says we're going to take down all the posts that are supportive of President Trump and we're going to leave up all the ones that are critical of him. As long as they announce that policy in advance and apply it in a consistent manner, that would be totally consistent with this act. Although there is also a provision in the bill, right, that says any post about a candidate can't be censored or deplatformed or deprioritized, right? That's almost right, Your Honor. So there is not a prohibition on censorship of speech by a writer. That comes with journalistic enterprises. That's true, and it also comes with the consistent manner provision. But it doesn't apply to the candidate provision. So the candidate can't be deprioritized. That's my own paraphrase. Is that basically right? The candidates, well, so we aren't challenging... Speech about candidates, sorry. Candidates can't be deplatformed. Speech about candidates can't be deprioritized. That's basically right, Your Honor. So it's speech by or about a candidate can't be shadow banned. For purposes of this appeal, we haven't challenged the provisions of the preliminary injunction that forbid enforcement of the post-prioritization elements of the law, but certainly the shadow banning prohibition would, you know, that is something that we're raising in this appeal. All right, so can I ask you another one? Sort of a macro, macro, macro question in my mind, and I'll ask Mr. Clement the same question. What role does sort of illicit motive have in free speech jurisprudence? You know, like in the free exercise space, I re-read Lacumi last night. It seems pretty clear that rightly or wrongly the Supreme Court has said, we'll kind of pierce through the face of the statute to look at what people said. The what people said here story ain't great for you, right? And so what role does that play in our analysis? What role should it play? So I agree with the court's characterization of the Supreme Court's free exercise precedence. It's a different analysis under free speech. Yeah, and explain to me why that is. I'm kind of puzzled about why it is. I'm not really sure what I think the answer should be to the first order question, whether or not we're looking through. But once we are looking through in the free exercise space, why are we not looking through in the free speech space, especially if it seems to me just sort of generalizing the point of the free speech clause is to prevent government from punishing people for speech they don't like? So the case I would point the court to is the Supreme Court's decision in Frisbee. I think it provides a good answer to this question, which is basically that it happens frequently that a regulation, a content-neutral regulation on speech is inspired by a particular incident or event. In Frisbee, what happened was there was a local government that adopted a ban on residential picketing, and it was clear from the history of the ban that it had been adopted in response to a series of anti-abortion protests outside the home of an abortion doctor. And the Supreme Court, what it did in Frisbee is it said, we're not going to look at the underlying motive or search for illicit intent here. Instead, what we're going to do is look at the face of the statute and ask, does this statute regulate speech in a content-neutral way? And in Frisbee, it did. It wasn't an abortion-specific prohibition. And so the Supreme Court upheld that regulation. The other key Supreme Court precedent to point to on this, Your Honor, is the Supreme Court's decision in O'Brien. And there the court had before it some legislative history that was a lot more sort of extreme than what we had in this case, where there were members of Congress who said, we need to pass this law so that we can stop these commies, stooges, and so-called students from burning their draft cards. Nevertheless, the Supreme Court upheld that law, and it in terms refused to look through to that legislative history and use that as a basis for invalidating the Congressional Act. Yeah, I guess, I mean, the reason I'm asking is that it seems like there's kind of some case law to go around for everybody on this, it seems like. You've got Frisbee and O'Brien. The other side, they're going to point to Turner where the court says, even a regulation-neutral on its face may be content-based if its manifest purpose is to regulate speech because of the message it conveys, C.F. Lukumi. And so I guess I'm just wondering about why it is that the law would treat free exercise cases one way and free speech cases a totally different way. You know, the best I can do to answer that question is to just point back to the fact that in the regulation of speech, it's just kind of an inherent sort of inevitable thing that we're going to sometimes have particular incidents that are the inspiration for content-neutral regulation. I guess one other point I'd make here, if I could, Your Honor, is— I suspect we're going to let you go on. I wouldn't worry too much. I saw you looking at the clock. It's my fault, not yours. Let me introduce another case here that I think is instructive on some of Your Honor's questions, which is the Rumsfeld decision. And the thing to keep in mind about the Solomon Amendment there is the Solomon Amendment was regulating, mandating the compelled hosting, not of speech in general. That is a viewpoint-specific, viewpoint-targeted law. Congress was saying there, we're going to insist that these law schools permit onto their campuses military recruiters who are going to express a specific viewpoint on a specific topic, which is the merits of joining the military. And what we don't see in Rumsfeld is any kind of analysis of whether the law was content-based or viewpoint-based. We don't get there because the First Amendment was never triggered. There has to be a First Amendment right triggered before we even do an analysis of whether the law is content- or viewpoint-discriminatory. So you think – I mean, I'll confess. I think the Miami Herald line of cases and the Pruneyard-Barrett line of cases are kind of tough to reconcile. But you think Twitter, YouTube, Facebook et al. look more like a law school than the Miami Herald? That just seems strange to me. Well, Your Honor, let me explain one way, one critical way in which they are more like the law school or the Pruneyard Shopping Center, which is the Miami Herald or the parade organizers in Hurley, they are making affirmative selections of the material that they include. So if I thumb through the pages of the Miami Herald and I see an article, I know the editors of the paper have chosen to run that article. And if I notice in the Miami Herald that a particular topic hasn't been covered, well, I know that the editors of the paper chose not to cover that topic. It's totally different with one of these social media platforms because Twitter says in its terms of service, for example, we may not have even read the material that's on our platform. Don't hold us responsible. But the piece of this case that you care about is the ones that it did read and kicked off, right? I mean, like the fact that it doesn't and presumably can't read every last submission or whatever post. Like where the rubber meets the road in this case is when Twitter exercises its content moderation policy pursuant to its own terms of service or community standards or whatever. And there, isn't it kind of picking and choosing just like the Miami Herald is? It's not picking and choosing because it's passively allowing people to post on the platform and then pulling things down. It's really important under these precedents to think about this in terms of what a reasonable listener would perceive, or reasonable viewer would perceive when looking at the material on one of these platforms. As in Rumsfeld v. Fair, if I look at the material on Facebook and I notice, oh, this particular subject isn't covered by any of the posts I see, I have no way of knowing whether that's because the people who run Facebook pulled down those posts or if it's because the users of Facebook didn't post anything about it. And that's just a fundamental difference between one of these social media platforms on the one hand and the Miami Herald on the other. I know when I look at the Miami Herald, every article in here is something that has been affirmatively selected by the editors of the paper, and that's just not true here. I want to give my co-panelists an opportunity. I've been monopolizing your time. You should keep going. They should keep asking questions. Let me just try to really emphasize the fact that this concept of misattribution is one of the key blue lines in the cases that we've been talking about. So with respect to misattribution, we see in Hurley, in Pruneyard, in Rumsfeld v. Fair, every one of those cases talks in terms of is it possible for a host, someone who's being compelled to host a speech, to distance themselves from the material that they're being required to cover. It's just a reality that we know from the record in this case that these platforms not only can but actively do distance themselves from the material that they host. They say we're not responsible. That is a huge difference between this case and Tornillo or even Hurley because in those cases, the people who were putting together the parade or the newspaper were adamant that they were producing an overarching speech product and took responsibility for the components of that product. We don't have that here. That's one of the key reasons that the First Amendment isn't triggered. Does that mean in response to the question I asked earlier, now I'm violating my own rule about asking more questions, but in response to the question I asked earlier that if Twitter had come out of the closet and said we're just going to be the liberal social media platform, it would be different because at that point they wouldn't have even purported to be objective and now they're just the liberal social media platform and they've owned all this speech or whatever, so it's different at that point? I don't think in that hypothetical, I don't know that it necessarily is different. The thing we should be looking for here is whether there's a common theme or collective point that's being made. If the only thing that Twitter does is say we're going to be the liberal social media platform, but it's still sort of passively allowing people to post what they want, subject to very limited content moderations, then I would say that Twitter still isn't on the right side of this line in terms of having First Amendment interests that are at stake. Now, I can imagine a case as applied. This is a facial challenge, but I can imagine a case as applied where you had a different set of policies that were very rigorous and insisting only posts that are on topic, that are specific to the topic that's being discussed or that present a particular perspective are going to be allowed. At some point in an as-applied challenge, a somewhat idiosyncratic social media platform might well have First Amendment rights, but what the court has before it in this appeal is a facial challenge that's brought by these giant social media platforms. I just encourage the court to look at pages 3 through 6 of the plaintiff's appendix. That's a declaration from one of the plaintiffs. It talks, I think, very compellingly about the great range of material and the huge volume of material that's being posted by these platforms. Under those circumstances, I think it's really difficult for the plaintiffs to claim that they satisfy this collective point, common theme test that we have from Hurley. Let me also, if I may, say a word about the common carrier issue. The first thing I want to say about that is that Flora agrees 100% with Justice Thomas' opinion in Biden against Knight First Amendment Institute. That's a separate writing of Justice Thomas that the plaintiffs don't even cite in their brief, but I think it presents a very compelling and scholarly treatment of this issue of common carriage. Can I ask you a question about this? Is your argument that in the nature of things, these social media platforms are common carriers, or that Florida, by fiat, can make them common carriers by calling them common carriers? It's neither of those arguments. My argument is that this is a regulatory designation that can be imposed by regulators under certain circumstances. Those circumstances, one of the key things, and again, I would just really emphasize Justice Thomas' writing on this. One of the key things is in every- In fairness, I guess. I mean, I'll add the Thomas opinion, but in fairness, it's very characteristically deep and scholarly, but it's also kind of tentative. He's saying there might be an argument that these social media platforms might be considered common carriers. He never really comes out and says, this is how it should be done. I don't disagree with that, Your Honor. I think Justice Thomas has an open mind on this question. I don't dispute that, but I think the argument that he sketches is exactly the right one, and one of the key sort of elements that makes it permissible to designate an industry as a common carrier is when that industry is affected with the public interest, and what that means, basically, is that in every sort of era of economic life, there are certain services that society determines people shouldn't be required to do without, and that was true of the telegraph in the 19th century. It was true of the telephone in the 20th century, and the Florida legislature is saying it's true of social media in the 21st century, and the thing about that designation is it's not just kind of an open-ended invitation to allow any kind of regulation under the sun, but what it does permit when an industry is designated as a common carrier is certain basic nondiscrimination rules, and if the court focuses on the consistent manner provision of this act, that's in its essence what this law is doing. It's saying whatever standards a social media platform wants to adopt, it has to apply those standards in a consistent manner and make its services available to everyone on those terms. So that is true of the consistent manner provision, but there are lots of other provisions, right? What about the one, for instance, that says any sort of speech or any post about a candidate, how is that not content-based? Even post-Austin, whatever the court said in Austin, I mean I can't imagine that that is not content-based, or the one that says sort of the journalistic enterprises provision I think says based on the content. Well, so let me take those one at a time if I may, and I guess first one overarching point, which is again, we only get to a content or viewpoint discrimination analysis if we include the person who is triggered. But put that to one side for a moment. With respect to the candidate provision, I would analogize this to provisions of federal law that require table operators to provide equal access to candidates for public office, and I think that's kind of a reasonable way of thinking about the way the candidate provision works. With respect to the journalistic enterprise provision, I just don't know. Does the equal access provision apply to stuff about candidates, or is it equal access to candidates? It's both. We've got kind of both going on here, right? You've got a candidate provision and then an about candidate provision. Right. Or a clause. As I understand the law, it posts by or about a candidate to get the benefit of this. Now, I guess candidates receive sort of the additional benefit of they can't be deplatformed, but it's important to keep in mind there that they can be censored, so it's not something that prevents a social media platform from removing a particular post based on its consistent application of its stated social media content moderation policy. But under no circumstances, I guess, could a candidate, presumably for any office, I can't remember the specifics of the bill, but could a candidate for any office be deplatformed even if he is like a serial purveyor of pornography on the site? He could be censored. He couldn't be deplatformed. The statute defines deplatforming as suspending an account for more than 14 days, and so the candidate in your honors hypothetical could be suspended for 14 days. But a journalistic enterprise couldn't even be censored for that, right? Yeah. I wouldn't speak specifically to the journalistic enterprise categorization, and there I think there's a very strong analogy to Turner One, and the reason is because what's going on in this law is there's this underlying sort of economic dynamic, which is very much akin to what was going on in Turner One, where you have these social media platforms that are a bottleneck that has, because of that bottleneck, they're able to exercise tremendous influence over journalistic enterprises, and if the court looks at our appendix, pages 237 through 48, that's a 2020 U.S. House of Representatives report that talks about the structure of this underlying market, and what's going on here basically is just as the cable operators had to broadcast television stations over a barrel economically in Turner One, so too the social media platforms today have journalistic enterprises over a barrel, and so what this law is doing is it's not reflecting a content-based preference for journalistic speech. Instead, what it's doing is it's recognizing an underlying economic problem and imposing a solution to that. Now, obviously, again, the Supreme Court applies intermediate scrutiny in Turner One, and that's not sort of where we think we are on the map in terms of the First Amendment doctrine. Our view is that none of these regulations or the hosting regulations at least regulate speech, but to the extent the court gets past that sort of threshold issue, we think the journalistic enterprise provision is very analogous to what the Supreme Court said was content-neutral in Turner One. Okay, I'm swearing a blood oath not to ask any more questions. I want judges to have flattened cards and have their time. Go ahead. I have one question, and I apologize for taking this out of the heart of the First Amendment discussion, which is very enlightening, but just as a practical matter, and I know that part of the court's decision is something that has to be settled, but is there any indication, any assurance that what the standards Florida imposes won't, in effect, be imposed nationwide? In other words, do we know that these platforms, in looking, maybe not have to do it by computer, so we can't de-platform these people because they're from the state of Florida, and we can't de-platform these people because they're from 20 miles over the state line in Alabama and so forth and so on? How, under the most optimistic projection of the Florida law, assuming it wasn't there, how are they going to work? So two responses to that, Your Honor. The first point I'll make is that the central business model of these social media platforms is to push advertising to people based on their location, and so the typical large social media platforms, they know within a block of where you are at any time, and that's the whole reason that they're as profitable as they are, is they are making money by feeding you advertisements that are based upon exactly where you are located. So that's one point. The second sort of practical point I'd make on that, Your Honor, is I don't think Florida has a law like this, but there are a number of states that have laws that regulate what kind of data platforms are allowed to use when they target people with ads. They're state-specific statutes, and we haven't gotten into discovery in this case yet, so I don't know the details of it, but we do know that these platforms are complying with those state-specific laws, and so I don't see a reason why the same technology that allows them to do that wouldn't allow them to comply in a Florida-specific way with this statute. I guess maybe the final point I'd make is that these platforms, the large ones, they're multinational corporations, and they absolutely must and do comply with the law in different countries without apparently being forced to use the same sort of censorship rules that they might have in Russia and the United States, and so all of those points, I think, point strongly in the direction that this is a law that could be reasonably implemented. That's one of the problems with the facial challenge, but I suppose the better answer is that that's one of the issues not before the court at this time. That's exactly right, Your Honor, and I guess one of the things I would point out just as a factual matter is that the plaintiff did bring a dormant commerce clause claim facially against this statute. That hasn't been brought up on the appeal. They didn't present it as an alternative basis for affirmance, and so it's not before the court. Yeah, that issue, in my interest, I know it is dormant, so to speak, at this time of litigation. That's correct, Your Honor. That's all I have to mention. Okay, very well, Mr. Barnes, thank you so much. Needless to say, we'll give you the full time on rebuttal. Thank you, Your Honor. All right, Mr. Clement, you've got 15 minutes. Good morning, Your Honor, and may it please the court. Florida's effort to level the playing field and fight the perceived bias of big tech violates the First Amendment several times over. It interferes with editorial discretion, it compels speech, and it discriminates on the basis of viewpoint, content, and speaker. In the name of promoting free speech, it runs afoul of virtually every restriction on state action in this sensitive context. Can I ask you to help me with the question that I'm sort of struggling with about viewpoint, I guess, and sort of the best evidence, it seems to me, the smoking gun evidence of viewpoint discrimination here is the signing statement. But what's the, I guess, two-part question. What's the best evidence that, in fact, the statute, the whole thing, as the district court found, is viewpoint discriminatory? And then the second part of the question is, can we do that in free speech land as opposed to free exercise land? So let me try to maybe answer that in reverse order. I actually think that the answer in free speech land is quite clear, and I think there's a reason my friend on the other side pointed you to O'Brien, because the reason that the court in O'Brien applied a rule where it didn't look to the legislative history is because the law was content-neutral on its face. But in the free speech context, once you have content-based discrimination and or speaker-based discrimination on the face of the statute, then the legislative history is absolutely fair game. I want to, in sort of non-technical terms, the way I would think about it is, once on the face of the statute there's speaker-based discrimination or content-based discrimination, effectively the burden shifts back to the state, and then at that point they have to come up with a completely neutral reason for why they're making speaker-based distinctions and content-based distinctions, and it's almost like they can't run away from the legislative history at that point. So I think that it doesn't completely solve your puzzle as to why in the context of a facially neutral law you can still sort of pierce it in the free exercise clause and not in the free speech clause. That puzzle remains, but the puzzle becomes a smaller puzzle if you realize that the court's case law, I think it's overwhelmingly clear, that when there are speaker-based or content-based distinctions, that it's fair game to go beyond the face of the statute to those kind of things. And I would say, you know, Sorrell stands for that proposition. Niflis stands for that proposition. I think Turner stands for that proposition. I don't think it's actually even in, as we pointed out in our 20HA letter about the city of Austin case, they sent that case back to consider whether there was an improper purpose. So this is a case where that's relevant. Now, in terms of that, I think that in the universe of things that aren't in the text of the statute, the thing that's probably most salient is the governor's signing statement because most of the concerns you have about, well, this is just one legislature and we don't know the collective motivations of the legislature, you don't have that with the executive officer of the state. And, you know, and at the moment that, you know, the Florida equivalent of bicameralism in presentment is being satisfied, you have a statement of the governor's intent. He is a skeptic. So I don't think it determines the motivation of the legislature. I think it determines the motivation of one of the constitutional actors who is a necessary component. Only in a context where that's relevant. And in the vast, vast, vast majority of laws, the president can say anything he wants and it doesn't matter because it's a content neutral law or it's a law that doesn't even implicate anything about free speech. But if you had a law that, you know, it's a Turner law, you know, at the moment the president had signed the law at issue in Turner, the president said, you know, the only reason I'm doing this is because I think PBS is liberal as all get out and so am I. So I want them to be carried. I want them to must carry obligations applied at PBS. I think that would be highly relevant and we take it into account. The president's signing statement made any difference in terms of the case? I don't have one ready at the podium. But even if you're a skeptic of that particular looking... You didn't have one ready in your brief, either, did you? No, in fairness, the president's signing statements are all run by the Office of Legal Counsel and the Office of Legal Counsel, if it were a non-neutral law, I think would tell the president to blue pencil that. So I think it may be a hypothetical. Is that evidence of what the executive branch intends? Excuse me. Hold on one sec. So Judge Carnes, finish your question and then we'll go to Judge Choklat. You think the Office of Legal Counsel would advise the president of that? Two things about that. We don't know. It might depend on who's in the OLC. And secondly, do we have access to OLC advice to the president? I don't think we do in an ordinary case. What I'm saying is you seem to give more weight to a governor's signing statement than you do to the presidential signing statements in terms of the case law. So with respect, Judge Carnes, we wouldn't. We treat them exactly the same. I want to get to Judge Choklat's question, but I also want to say, if you're reluctant to go there, I mean, you do have things on the face of the statute. I mean, the legislative findings say that the editorial discretion has been applied unfairly. So you could use that as a vehicle to determine what do they mean by unfairly. I understand that. I appreciate it. But that wasn't my area of concern about the governor's signing statement. But we've had as much exchange as we've brought them all back. So you would go to Judge Choklat's question. Well, it seems to me that the statement might be evidence of how the executive branch intends to enforce the law. I think that's true. But I think even the statements not just about prospectively how we're going to enforce the law, but what the governor thinks he's accomplishing by signing the law into, you know, so that it has the force of law. Again, my point is not that that's the best evidence of what the legislature was thinking, although I think it's probably even weak evidence of that. But I think it's really great evidence of what the governor was doing at the moment that he took a necessary step for the bill to become a law. And in all events, you know, I think that we don't stand with that statement alone. It's somebody who sort of grew up being a little bit skeptical of legislative history. Does your case hang on that statement? No, it doesn't. But I do think, just to be as clear as I can, I do think the motivations of the legislature and the governor do become relevant in a case where, on the face of the statute, there are distinctions drawn on the basis of content and speaker. And I think this law does both in phase. You start with the fact that this only applies to the large social media platform. And that's a speaker-based distinction that, in a context like this, I think at least raises a serious question of whether the reason the large social media providers are being singled out is because of a perceived bias that they have. And when there's statements by then the governor, but also many legislators, that we're trying to get big tech because big tech is liberal, and common sense tells us that, you know, a few sort of more conservative entities like Parler are, at this point, smaller, it certainly suggests to me that there's a problem with that being just a speaker-based law. But even if you just want to stick to the face of the statute, one of the things that the law tells us, in the Sorrell case, for example, tells us that when a law implicates the First Amendment free speech clause, and in Sorrell they said just the dissemination of information triggers free speech clause, and then the law has speaker-based distinctions in it, that's enough to trigger heightened scrutiny right there. And I read the government's brief, the state's brief here. It's a little opaque to me, but they seem to, if the intermediate scrutiny is triggered, they seem to not want you to reverse. So can I ask you a question about the speaker-based distinctions? Because I'll just confess, I don't think I know this sort of subarea of the law well enough. I guess I've always thought in terms of viewpoint discrimination, content discrimination, and then there's this thing, speaker-based discrimination. Is that its own category that triggers its own sort of level of scrutiny, or is it indicative of something that triggers a level of scrutiny? I think it's both. Okay. So I think Sorrell stands for the proposition that it triggers heightened scrutiny, and the court went out of its way to say that in that case, because there was an argument about commercial speech, so the court went out of its way in Sorrell to say, I don't want to decide whether it's intermediate scrutiny or strict scrutiny. The law fails anyways. So I think we know that speaker-based distinctions of their own accord trigger at least heightened scrutiny, and then they also, I think, raise a strong inference that what's going on is content-based discrimination or viewpoint discrimination. And then if you have that, that clearly triggers strict scrutiny. Got it. So I don't want to drag us back down into the legislative history mud pit necessarily, but the parties have debated in 28-J letters how we ought to think about the Disney carve-out repeal, and I'll ask Mr. Barnes when he stands back up in fairness to him. So how does that play here? Well, I think it plays in the following two respects. If you take a snapshot of the law the day it passed, the carve-out for a subset of big media, big social media platforms as defined in the statute just really is terrible. I mean, it just seems like it's obviously kind of speaker-based distinctions that are indicative of either viewpoint or favoring local enterprises. So even the state sort of recognized that that was problematic, but then they did it in a context where they seemed to be motivated by all sorts of viewpoints again. And so I think in a sense they've kind of doubled down on indicating. It's almost like a text case or a real-world demonstration of why speaker-based distinctions are problematic, because once you start picking favored speakers, it becomes very easy to use that as a guise for viewpoint discrimination. And so Disney and sort of Universal got singled out because they kind of liked them a little bit better because they employ a lot of people in the state, but then Disney started saying some things that the state didn't like, and all of a sudden, zoop, that gets changed around, and it's still viewpoint discriminatory. I mean, you can imagine statute that said, we're going to apply this only to newspapers that have a circulation of a million or more with the exception of our in-state newspapers. And then one of the in-state newspapers just rips into the governor and the legislature, and they say, ha, forget that. We're going to get rid of that little carve-out for the in-state ones. I think it would show that the whole thing was kind of rotten at the core. And I do think if you analogize this, and I'm sure we're going to talk about the differences between newspapers and what my clients do, but if you imagine a law that singled out just the largest newspapers with a certain circulation, I think that might be unconstitutional on its face without going any further under like Minneapolis Star and cases like that. But then if you had any inclination in the legislative history that the reason that they singled those out is because that comfortably captures the New York Times, the Washington Post, and the L.A. Times, and doesn't capture a few papers we like, I think that would be the most obvious First Amendment violation the court had seen in a long time. So I do think just the speaker-based distinctions are problematic. And the thing that is, I think, both important and potentially convenient for deciding the case is every provision in the statute is only applicable to the large social media platforms. So if that speaker-based discrimination is problematic, that plainly takes out the entirety of the statute. Can we talk – you sort of began to segue there, I guess, about the differences between traditional newspapers and what you guys do. Mr. Barnes' point is like the traditional newspaper is much more sort of hands-on in terms of the content that it's moderating, so to speak, affirmatively accepting and rejecting. And I guess the idea is that social media platforms don't and maybe can't do that. But it does seem like there is a difference in sort of active-passive land. So I think there's a difference, but I think at the end of the day, it's not a difference that matters. And I think Your Honor captured it in one of the phrases that you used in a question to my friend on the other side. Where the rubber meets the road is where the editorial discretion is being exercised. It may be that compared to a newspaper's editorial page, my clients exclude sort of far less content, but it's what they've excluded that the whole controversy is about. That's where the rubber meets the road. That's what's obviously gotten people's ire up, and that is exactly what the state is trying to override. And in that sense, I really do think Hurley answers most of these questions in our favor because one of the principal arguments that the state and the would-be parade participants made in the Hurley case was, look, you guys let almost anybody who shows up and is even vaguely Irish get into this parade. You are not applying some sort of discriminating characteristic. It's a nearly all-comers policy, and yet you won't let us march. And, of course, the parade organizers didn't let the gay pride Irish organization march, and that's what the whole case was about. The state law said, no, you've got to take them. The parade organizers said, no, that implicates our expressive rights, and the whole controversy was just about what they excluded. So I don't think at the end of the day whether you're a 99% out editor or a 99% in editor allows the government, doesn't matter, the government still can't override your editorial discretion, especially when that's clearly where the law applies. There's a lot of places we could go from here. One of the places I guess I would want to make a point about is there are these various interlocking provisions, and sometimes in response, I thought my friend did a clever job in responding to your question about what about sort of the hypothetical overtly liberal Twitter, but he sort of took you to the consistency provisions in that colloquy. But one place to go in that colloquy to show you how problematic this law is, is I want to talk about the consistency provisions before I sit down, but the journalistic enterprise provision and its anti-censoring provision would say that even overtly liberal Twitter has to carry Fox News. Well, that completely messes up what they're trying to do, and to take a more real world example, I think the way the statute is written, Etsy has to carry Fox News. Now, Etsy has no interest in carrying Fox News. They want to be a handcrafted sort of site for exchange, but they're captured in the statute because they're a popular site with a sufficient number of users, but apparently they can't exclude a censor journalistic enterprise. It's even more problematic for liberal Twitter. So your Etsy hypothetical makes me wonder about the difference between Pruneyard and Fair. The Etsy hypothetical feels more Pruneyard to me because the shopping center owner in Pruneyard, he didn't care a whit. He just didn't want trespassers or whatever. In Fair, Fair I think seems tougher because in Fair, it seems like everybody kind of knew that the law schools objected. They had like this principled objection to don't ask, don't tell, and they were, however clumsily, sort of expressing their viewpoint and saying to the recruiters, no thanks. That sort of feels like more what Twitter is. I'm not saying that Twitter is a law school any more than it's a newspaper, but it has sort of an expressive viewpoint in the way that the Pruneyard people didn't. But then I guess my question is like how different is Fair really? So let me get word about Pruneyard and then talk as long as you want about Fair. So Pruneyard, the way the court has distinguished Pruneyard in every subsequent case is precisely because Pruneyard didn't care. It was more like a property rights case at the end of the day. They didn't care a whit about what they were saying. They didn't have any objection to what they're saying. And these cases are all about material that we have an objection to that they want us to carry anyways. And so I think Pruneyard is just frankly irrelevant. Now, Fair is more relevant, but it's readily distinguishable. To me, the easiest way to think about why Fair is different with a comprehensive reading of the opinion is that the court was very focused on the recruitment function of the law schools. And I don't think Fair would have come out the same way if the Solid Amendment purported to say that law professors had to have military people as guest speakers. Or even if it said as long as you have any guest speakers, you have to give equal time to military speakers in your classroom. I think that would have been a clear First Amendment violation. I think it was critical to the court that it was the recruiting function. I think it was critical to the court that there's a direct line to the recruiting function and the power to raise armies, literally to raise armies to recruit people. And they literally said that all the speech interests were ancillary. And so I think that if all Florida tried to do is to say that in the job postings that my clients did, they couldn't exclude people of a certain race or they couldn't exclude military members, I think that would be more, but left the real expressive action of our sites alone, I think that would be more parallel to the Fair case. Another important distinction about Fair, though, is it was very important to the court that the recruiters were given access, but that right on the bulletin board outside, the court pointed to, pointed to the Solicitor General's concession, that the military, that the law school could post a disclaimer right there and say, you know, we disagree with the military's policy, don't ask, don't tell. So a disclaimer in close proximity. They couldn't interfere with the actual sort of recruiting exercise, but they could have their disclaimer right there. This policy, of course, as to journalistic enterprises, part of the definition of what it means to censor is we can't post a disclaimer there. Now, they say, well, yeah, but you've got lots, you've got a big megaphone, you can complain all you want, you can make clear that we're only doing this. But the censor provision, one of the things it specifically targets is our ability to post an addendum. So if you go back to your hypo about the liberal Twitter, not only do they have to post Fox News, but they can't even say, we think this is a lot of drivel, you should see our other material, you should go to our home page to see what we really think. They can't do that. And no law that I'm aware of, I mean, you know, given how important it was in FAIR that you both had the recruitment function and you had the ability to post a disclaimer, I think in two critical respects this is much worse from a First Amendment sort of viewpoint. And to me the way to understand FAIR and try to reconcile with everything else is really the idea that the court viewed the recruitment function as a situation that wasn't expressive, the expressive activity was at best ancillary. I think that's why they drew the analogy to the speech of, you know, white applicants need not apply in the hiring context. I just really think that's the way to reconcile it, because you're right to say that there's some tension in these cases, but I think FAIR, you know, distinguishes itself because of the recruiting context and the ability to post the disclaimer, which we don't get. We're denied that by state action under the statute. So I think that, again, just to kind of one other point, again, my friend said, you know, that is why the inability to post disclaimers, to censor on journalistic enterprises is so problematic, because that would be the easiest way to sort of deal with misattribution. I also think sort of misattribution, I think at that point in the argument there's two problems. One, at that point my friend has all but conceded that we're applying some kind of heightened scrutiny to this First Amendment context. So, you know, my friend wants to take the sort of the sweep from the Turner case, but wants to sort of ignore the bitter that Turner said that this was forcing somebody to convey somebody else's content is First Amendment activity. That's why the court applied heightened scrutiny. So I don't think you can sort of pick and choose in that way, and I think in this context where you're disseminating information, you are associated to some degree with that information, the ability to make clear that it's not yours is at a minimum critical, and the journalistic enterprise censor provision overrides that as to some of the most sort of important material. Another point I think that's just, and I don't want to overstay my welcome, so please tell me to sit down as appropriate, but I do think as you sort of walk through the provisions of this statute, I mean I think the provision that literally says that you can't provide the deprioritization or the shadow banning statements about candidates, that is as nakedly content-based as anything I can imagine, and I just don't see a way given that we're engaged in disseminating information and making editorial decisions that have upset people, how that's not enough to trigger strict scrutiny. As to that provision, we talked about the compelled speech aspects of this, the overriding of the editorial discretion. Maybe the last thing I'd want to say before I sit down is, you know, Judge Carnes asked this question about sort of the practicalities of trying to, in a global enterprise, comply with Florida law. The practicalities of that I think can wait for a more fully developed record, but I don't think you should assume that it's easy. But I guess my reaction to the discussion about sort of the common carrier point is related to this, because if anybody's going to turn social media platforms into common carriers or try to do that and see whether it survives the First Amendment, it would seem like it would almost have to be the federal government, not state by state having their sort of conception. I also think it's an odd concept that we think you're a common carrier, we want you to be a common carrier, but we're really upset by your actions that show that you're not a common carrier. We recognize, as you pointed to, one of the things in the journalistic enterprise provisions that says we can't deplatform or censor people kind of based on their content. So the statute itself recognizes that what we've been doing is making editorial judgments based on the content of the speaker's speech on our website, and they want to override that. So it's like we're not acting like common carriers, and that's what upsets them. And the second piece of this, and why I really think it would have to be a federal solution, is we think the right way to decide this case is on the First Amendment free speech grounds. You know, there are obviously these preemption issues in the case, but as this court sort of held in the Otto against Boca Raton case, when the non-constitutional issues aren't as positive as the whole case, then sort of normal constitutional avoidance doesn't apply. And there's at least a couple of these provisions in the statute, like disclosing your policies. Mr. Clement, you promised this would be the last thing you were going to say. I want to modify your promise a little bit by going back to the Disney exemption because I think there's an issue there that may extend far beyond the First Amendment context. To the extent that one can look to legislative history and sign a statement of what not, and I doubt that a signed statement is part of legislative history, but to the extent you can look to that, when does it end? In other words, if you make, if the court makes a determination, we're not going to allow this because the legislature had a bad motive. They had a number of motives, and one of them was that. How long does that thing exist? And the legislature then in the next session say, me a couple, we a couple. We don't have that motive anymore. We don't want to do that anymore. We understand. We read Mr. Clement's statement, and boy was it persuasive, and we don't want any part of that. If the state can reenact the same statute with the post enactment deletion of the exemption in that statute, would that cure the problem? Would that change the result? Does that make it non-discriminatory? So I think if the state does all that, it's going to have a better case. I'm not sure it gets them completely. That's obvious, but what I'm saying is, when does the tank end? Is it when the sponsors in the legislature are no longer in the legislature? Is it when everyone who was part of the majority voting for that is gone? How long? So I think the legal answer would be as long as it seems that the efforts to avoid that explanation are pretextual. I mean, I think you'd have the same thing. Do you have an amnesty in New England to tell us what the pretext was? That's what we're going to imply. Well, I guess I would say I would hope not. I don't think this isn't a question about invading legislative privilege or anything like that. This is all operating based on what's already in the public record about what people were sort of boasting about their intents. I'm asking you to assume the public record is the legislature in the next session. Does it the same thing that the person in that legislation did and said, we disavow any motive, we censor anybody who might have that motive? Here is our pure heart legislation. What do you do next under your approach to legislative motivation? So I think the answer is you do exactly what you'd have to do if the Lakumi, if I forget, no, I guess it's the Hawaii City Council, passed the same statute the next day. I mean, if they pass it the next day and they say, well, we have a pure heart, I think most people would doubt that. If they pass it... How long would you have us fight in the law, must wait before it incurs this smirch on the legislation? I think if they want to enact the same law verbatim, they would be well advised to wait a bit. And I'm sorry that's not a great answer, but... We have a difficult standard to apply. I'm just suggesting to you that there is comfortable and probably insoluble, unsolvable problems with suggesting that the motivation of the legislature that is not reflected in the text itself has a taint that makes a difference. It either makes a difference or it doesn't. If it makes a difference, when does it stop making a difference so that a future legislature can do it with a pure heart? So I think the final answer is when there is a basis to say that there's been a circuit breaker between the bad intent and the new law. And I realize it may be unsatisfying. I think Judge Newsom alluded to the threshold question of whether you should ever look to anything beyond the text. But there are contexts where the Supreme Court has done that, and it does create this uncomfortable inquiry. But with respect, I'm not sure you should blame me for it because this is an inherent feature of the existing law that you have to do this at some point. And that's why I do think if I were advising the legislature, I would say make sure you make some non-trivial changes to the text of the statute as well because that will help you sort of say that it's a new day and this is a new statute. But in all events, I also want to be clear. I think going into the legislative history, the governor's statement, the like, makes this an easy case, but I don't think it's a hard case without that. The text of the statute discriminates on the basis of content. It discriminates on the basis of viewpoint. It's all about— I know. I understand. I understand you. And for that, I didn't mean to take you back through it again. I think we've touched on these changes. I've seen it time and time and time again, and I've never seen the court address what next. If they could have done this without a bad motive, when can they do it without a bad motive in the future? I'll give you my best shot at that. There does have to be some kind of— Sometimes there's a breaker. I appreciate it. I have two tiny questions. One, just housekeeping. If we don't—housekeeping-ish. If we don't view this as inherently viewpoint discriminatory or content- and speaker-based discrimination such that it allows us to consider the rest, and we need to walk through this provision by provision by provision, and without naming them, do you acknowledge that some of the provisions here are not content-based? Some of them are content-neutral, and some of the disclosure requirements would be subject to some even lower, presumably, level of scrutiny. Yes, with the following caveat. Some of the ones that are content-based and speaker-based are still clearly designed to override editorial discretion, which is a separate First Amendment no-no, if you will. I think you'd have heightened scrutiny for that. The discretion that's applicable to the disclosure provisions is lower, perhaps, than heightened scrutiny, but it's not rational basis review by any stretch, and some of these disclosure requirements are incredibly burdensome, given the amount of decisions that are made to take material down. I mean, it may be a small percentage, but as a volume matter, it's huge. And just to go back to my favorite example, but like, you know, ETSI's got to explain every time it makes a decision that something's not handmade, so your mass-produced material can't be on our handmade website, and they've got to do that in conjunction with these fairly onerous disclosure requirements that disclose the reason why and maybe even explain how the algorithm worked to take you out. I mean, that seems to me that would flunk the scrutiny that applies to disclosure requirements. Okay, last question for me, and I'll ask Mr. Barnes the same question, remedial. Maybe the dumbest question of all time, but why isn't anybody in this case talking about freedom of the press? Would it have made any difference to the analysis? So, I think the only way that it would make any difference in the analysis would be to the extent that you think that there is a discrete freedom of press analysis that applies to sort of like the subscriber limitation, and, you know, that, you know, because, you know, the Minnesota, Minneapolis are kind of a lot of cases, seems like they're a distinct sort of freedom of the press context. But beyond that, I'm just not sure why the fact that sort of the press is, you know, different from the free speech analysis here. I will say just one thing on that, which I think is maybe worth sharing. You know, the very fact that the framers did sort of single out the freedom of the press, I think, is because the press is uniquely expressive, and that's why I do think on reflection, the journalistic enterprise sort of forced carry provision is particularly problematic, because the people who are being singled out for forced carry and nondisclaimers and all of the rest are people who have a distinctively expressive message. You know, it's not just like we've picked random people and we've tried to do things to minimize the impact on the expressive impact on your editorial discretion, your curatorial discretion. We've taken people who are kind of like in the speech business and we've said you must carry all of their speech, even if you disagree with it or even if it otherwise, you know, creates problems for you and, you know, you can't put the disclaimers on it. So in the same way that the Constitution sort of singles out the press and doesn't give it like a lot of independent bite because they're so expressive, kind of forcing somebody to carry, you know, every press entity in the world, including ones that they think are violating their policy or would trigger their algorithms, because that's like the whole point of that provision, right? You have algorithms, you have policies, and we want you to essentially exempt anything that's a journalistic enterprise. That seems to really get at the heart that you just can't pass this off as non-expressive. Everything about this is, you know, is motivated, I think, ultimately by a concern that we're calling favorites, but it's also an effort to kind of override those decisions and get information out to people in a way that clearly implicates the First Amendment. As Sorrell says, disseminating information is protected free speech context. Even if you don't think we exercise a lot of editorial discretion, we clearly disseminate information. Very well. Thank you very much, Mr. Clement. Mr. Barnes, you have five and, I suspect, more than five minutes. Thank you, Your Honor. Let me start by making sort of an overarching observation about the way the plaintiffs are arguing this case, which is that there's a bit of alchemy going on where Mr. Clement points to a couple of provisions that he says are content-based, and then he focuses on those provisions and says they provide a justification for throwing out the whole statute. That's just fundamentally not how the Eleventh Circuit or the Supreme Court do First Amendment analysis. We've got to march through the provisions of this law provision by provision and assess whether the plaintiff's challenge to those provisions is likely to succeed on the merits. We heard Mr. Clement talk about the addendum provision, and I think that's an important illustration of the point that I just made, which is that there's a severability clause in the statute, and if the court is persuaded that that provision, that element of the definition of censorship is unconstitutional, that's not a basis for throwing out the whole law. It's a basis for striking that one provision. We think the addendum provision is a reasonable time, place, and manner type regulation of speech. We acknowledge that that provision in particular does regulate the platform speech, but we think it's a reasonable content-neutral regulation that's designed essentially to facilitate the hosting provision. So you can imagine in FAIR if the law schools had said, well, we want someone in a room when a military recruiter is talking to prospective recruits, and every time the military recruiter says something, we're going to have our person interject in the middle of the conversation or talk over what the military recruiter says. Those kinds of actions would have completely thwarted the hosting that was required by the Solomon Amendment, and Congress could reasonably and did in fact require equal access to those military recruiters, and that's something that the Supreme Court upheld. There was also a suggestion in the colloquy about the idea that, well, perhaps the governor's signing statement reflects how the executive branch intends to enforce this law. One thing I'll just note, under this act, most of the enforcement authority is put on the shoulders of the state's attorney general, who is a separately elected official, and so to the extent that the court is concerned about the way this law would be enforced, I don't think the signing statement really tells us anything about it. I think the real point of the colloquy really was that I don't know how many members there are in the Florida State Legislature, but just analogizing to the U.S. Congress, there are 535 voices on one side of the lawmaking process, and there's one voice on the other side of the lawmaking process. Both are necessary pieces of this, and for better or worse, in Lacumi Land and elsewhere, sometimes we kind of cherry-pick little statements among the 535, and I think the point anyway was if we're going to do that, why wouldn't we take the one who is like 50% of the lawmaking process? Well, again, to emphasize, I don't think we are in Lacumi Land. We're in O'Brien Land. It's very clear in O'Brien about the merits of looking at legislative history in a case like this one. I'd also point to – Okay, so let me ask you this because you can tell I'm both interested and confused by this whole thing. So what about Mr. Clement's point that O'Brien is different because that law on its face was content neutral, and so there was no – what I took him really to say was that there was – here there's kind of like a gateway to get through to the yucky stuff because you've got on its face, you've got content based in part, speaker based, maybe in whole, maybe in part, and so there's a gateway to sort of get through to the yucky stuff in a way that there wasn't in O'Brien. And that goes back to my point, which is that even if the court is persuaded that there are content based categorizations of speech here, and again, we contest that, and we also don't believe that this law regulates speech on the part of the platforms in the first place, but if you get past both of those points and are persuaded, no, this law does make content based judgments and categorizations, that's not a basis for throwing out the whole law. What about the speaker based piece of it, which I confessed some confusion about? I think the law is sort of the whole thing is speaker based in the sense that it applies only to platforms with 100 million in revenue and 100 million users or whatever, and so it really gets kind of only the big tech Silicon Valley giants. It doesn't get smaller platforms. So it is speaker based, so how does that play in? A factual response and a legal response. So factually, this act's definition of social media platform is actually quite a lot broader than other models of legislation that we see in this space, and the $100 million revenue provision in particular, that sweeps in the great majority of any kind of platforms you could think of. There was reference to Parler. Parler is a privately held company. We don't actually know what their annual revenue is, and so the plaintiffs say that Parler isn't covered by this law. The state doesn't know on what basis the plaintiffs are saying that. Mr. Barnes, there's a discrimination between large platforms and small platforms. It's only the smallest conceivable. I understand. Some are regulated and some aren't. And is it legitimate to ask the question why? It is. Okay. If it is, then where do you look for the answer? Right. So it is legitimate to ask the question why. Let me try to. Putting aside what some legislator may have said on the floor of the legislature. Sure. I think as the state's counsel, I am. But that's at the heart of discriminating between speakers, I suspect, is why. Let me give the answer for why. Well, I want to know where do you look for the information to determine why. Right. So I think we can look at the legislative record, and one of the things that the legislative record shows. We have some findings. We have some findings. We also have materials that the legislature considered as part of the legislative process. So we have a trial of what's before the legislature. Is that what you say? I think it's limited to what's before the legislature. Then you would go outside of that, too, and examine what the small speakers say and what the large speakers say. It wouldn't be a question of examining what the small and large speakers say, but looking for sort of the objective purpose behind it. How do you determine the limits of why inquiry? Right. So I think there are two places that the court can look. One is the materials the legislature actually considered, and the other is the representation of what the counsel for the state says is the purpose of the law. And let me explain the reason that the legislature drew the line that it did in terms of the big versus the large. And it comes down to the economics. I just want to make clear. I mean, is this testimony? It's not testimony. What I point the court to is the legislative record here, which includes this. You're summarizing information that is elsewhere to be found. Yeah. Give me just a moment. Yeah. So the place to look for this is our appendix, pages 211 to 21 and pages 237 to 48. And here's the key point is there are these network effects. When a social media platform becomes large enough, there's this dynamic where it becomes very difficult for people who have joined the platform to switch to a different platform. There's kind of a natural monopoly as a result of the network effects that are associated with these large social media platforms. And what the legislature is trying to get at is this sort of market failure where the network effect prevents people from switching in response to a problematic content moderation policy in response to the unfair application of a stated content moderation policy. That's the market failure. And under Minneapolis Star and the other cases that the other side cites, it's a perfectly legitimate thing for a legislature to draw lines, speaker-based lines, based on that sort of judgment. And I'd also point the court to Turner, too, which makes clear that this court, the federal courts in general, have a significant obligation to defer to legislative judgments when a legislature makes predictions about how the economics of a particular- But that doesn't answer the question of how far, what are the limits of the inquiry. Right. So I think the limits of the inquiry are number one. Obviously, it's not what lawyers say in a brief. It's not what lawyers- Or what legislative council summarizers, this, that, the other thing. It's not what lawyers say in a brief, but I think the state legitimately- Some things we take judicial notice of. Right. The industry, for example. Sure. So the court can take judicial notice of things. Well, that's evidence. Right. But I think the state would also be permitted at a later stage of this case to put on evidence. I think that's a totally well-accepted and commonly done thing in First Amendment cases. I don't think the court is limited to the legislative record. But here, I guess what I'm trying to emphasize is the legislative record actually does supply an answer for why the line was drawn the way it was. All right. So let me ask you this. Once we're down into kind of the muck and the mire, I guess, is it just sort of pitting that very valid-sounding justification, this economic network effects thing, which I don't purport to understand, but it sounds very valid, against the signing statement? Is that it? I mean, because the signing statement is also sort of part of the record, so to speak, of the law's passage, but it doesn't say anything about network effects or economic power, really. Yeah. I don't think that- I mean, under O'Brien and this court's decision in Ray Hubbard, I don't think that the signing statement is a legitimate source for the court to look to in trying to discern whether this law is making content-based distinctions. But I should hasten to add that in order for a law to make content-based or viewpoint-based distinctions that are problematic under the First Amendment, there has to be a threshold determination that these platforms' First Amendment rights are triggered. And that's the primary argument that we brought to this court, that what we have here is more like fair and pruneyard than it is a parade or a newspaper. And so if the court agrees with us about that, then it's not going to get into these subsequent questions around the legislative history and the rationale for the law and what is or isn't problematic. Let me also, I guess, just one final thought, if I may, on the issue of disclosure, the disclosure requirements. The record that the plaintiffs have built around those disclosure requirements is very thin. We don't know from the materials that they've put before the court as part of their motion for a preliminary injunction what disclosures these platforms already make. We don't know what would be involved in complying with the additional disclosures that are required by this law. And so, you know, I think the parties are on the same page in agreeing that Zouderer is the right framework for assessing whether these disclosure requirements are permissible under the First Amendment. And the plaintiffs just really haven't come close to meeting their burden of showing in kind of specific ways that the requirements here are unduly burdensome. Oh, in fairness, I guess. I mean, I don't mean to put words in the plaintiff's mouth, but both from the briefing and from today, I gather the disclosure provision they care most about is the one that says you've got to give a thorough explanation for every censorship decision. I'm paraphrasing, content moderation decision that you make. That does seem like it would be pretty burdensome, doesn't it? Well, I don't know, Your Honor, because I plead the court to the Santa Clara principles that the plaintiff's sort of largest, most prominent members, many of them have signed onto that include a set of principles that, yeah, it's a good idea for platforms to provide exactly the kind of information that this law is requiring in that context. And at the end of the day, the burden is on the plaintiffs to make the factual showing that's necessary to justify the preliminary injunction. And with respect to the disclosure requirements, they simply haven't met that burden. Very well. Thank you both very much. Well done on both sides. The case is submitted, and we'll move to the second case.